Filed 4/15/26  In re N.C. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re N.C., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>M.C. et al.<br><br>    Defendants and Appellants. | G065919<br><br>(Super. Ct. No. 25DP0260)<br><br>O P I N I O N |

Appeals from orders of the Superior Court of Orange County, Daphne Grace Sykes, Judge. Affirmed in part, reversed in part, and remanded with directions.

Caitlin E. Howard, under appointment by the Court of Appeal, for Defendant and Appellant M.C.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant A.D.

Leon J. Page, County Counsel and Debbie Torrez and Samara Belgarde, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minor.

\* \* \*

M.C. (Father) and A.D. (Mother) appeal from the juvenile court's jurisdiction order in which the court found their son N.C. (the child) came within its jurisdiction under Welfare and Institutions Code section 300, subdivision (b)(1).[1] Father also appeals from the court's disposition order removing the child from his custody and providing Father enhancement services.

For the reasons we explain, substantial evidence supports the juvenile court's jurisdiction finding; we therefore affirm the jurisdiction order. Insufficient evidence, however, supports the disposition order to the extent it removes the child from Father's custody. We therefore reverse the disposition order as to Father and remand with directions, inter alia, the court return the child to Father's custody with family maintenance services.

FACTS AND PROCEDURAL HISTORY

I.

THE NONCUSTODY CHILD WELFARE PETITION

On March 7, 2025, the Orange County Social Services Agency (the Agency) filed a noncustody child welfare petition on behalf of the child, who was then 20 months old; that petition was amended in August 2025 (the

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

petition).[2] The petition alleged the child came within the jurisdiction of the juvenile court under section 300, subdivision (b)(1) because the child suffered, or there was a substantial risk the child would suffer, serious physical harm or illness as a result of the failure or inability of the parents to supervise or protect the child adequately.

The petition alleged, on February 9, 2025, Mother and Father were in an argument when Father, while holding the child in one arm, placed his other "forearm[] across [Mother]'s chest with force, causing . . . her to be backed up against the wall." Father "then dragged his forearm down as it was still on her chest, causing . . . her to fall onto the floor." The child "was crying during the incident."

Mother's 12-year-old daughter, I.B., who was showering during the incident, heard a door slam and also "banging on doors."[3] She ran out of the shower when she heard the noises and then heard Mother and Father "verbally arguing and yelling while [Father] was carrying the child."

I.B. later heard Mother inform Anaheim Police Department officers that Father had slammed Mother on the ground. I.B. and police officers saw redness on Mother's chest and scrapes on her arms.

Father reported Mother grabbed his shirt collar while he was holding the child and punched his right ribcage three or four times. Father did not appear to have been injured. Father was arrested.

---

[2] At the jurisdiction and disposition hearing, the juvenile court amended the petition by "excis[ing] from consideration" certain allegations of the petition.

[3] The original petition was also filed on behalf of I.B. but later dismissed as to I.B. for insufficient evidence; no party raises any issue regarding that dismissal in this appeal.

I.B. reported she was scared for Mother when Father was in the home, worried about Father hurting Mother, and felt the need to be physically with Mother in order to protect her. She stated she wished Mother and Father were not together.

Mother reported another domestic violence incident had occurred a few days earlier during which Father picked up Mother and Mother punched him once in the ribs "to try to get away." Mother stated Father "slammed her against the door." Mother stated Father grabbed her right wrist and told her she "wasn't going anywhere." Mother's arm was scraped and her wrist was bruised during that prior incident. Neither the child nor I.B. witnessed that prior incident; the child was home but asleep at the time. Father denied the prior incident occurred.

Father declined to be interviewed by the Agency. A verbal preventative plan was created with Mother in which she agreed to "walk away, go to the maternal grandfather's home in Cypress, and/or call law enforcement to prevent a future possible incident of domestic violence from occurring." Mother and Father thereafter refused to participate in the creation of a safety plan and stated their attorney advised them they did not need to submit to an interview with the Agency.

The petition further alleged Father had a criminal history which included convictions and/or arrests for driving without a valid driver's license (Veh. Code, § 12500, subd. (a)), unlawful possession of a controlled substance (Health & Saf. Code, § 11350, subd. (a)), driving under the influence of alcohol or drugs (Veh. Code, § 23152, subd. (a)), and driving with a blood-alcohol content of 0.08 percent or more (Veh. Code, § 23152, subd. (b)). It was also alleged Father had convictions and/or arrests resulting from the February 9, 2025 incident for inflicting corporal injury on a cohabitant (Pen.

Code, § 273.5, subd. (a)) and child abuse without the possibility of great bodily injury or death (Pen. Code, § 273a, subd. (b)).

## II.

### THE CHILD IS DETAINED AND RELEASED TO MOTHER

The same day the original petition was filed, a protective custody warrant was issued to remove the child from the parents. At the initial hearing on the petition held three days later, the parents each denied the allegations of the petition. The Agency argued the child should be detained because there had been more than one incident of domestic violence between the parents while the child was home and the parents have not since taken any steps to demonstrate insight or to correct or modify their behavior or participate in any of the services the Agency has to offer. The Agency added it had been unsuccessful in its efforts to reach out to family members to create a safety plan.

At that same hearing, Mother contested detention of the child. Father submitted to detention as to himself but objected to detention as to Mother and expressed his willingness to move out of the home to make that possible. He also agreed to comply with any restraining orders issued by the juvenile court.

The juvenile court ordered the child detained from Father but to remain with Mother under specified protective orders, which required, inter alia, Father to move out of the family home and Mother to not allow Father unauthorized contact with the child.

## III.

### THE JURISDICTION AND DISPOSITION HEARING

After several continuances, the jurisdiction and disposition hearing took place over three days in August 2025. The juvenile court

5

accepted into evidence the Agency's reports dated April 7, 2025, May 16, 2025, June 30, 2025, and August 6, 2025. In addition, I.B. and the assigned social worker each testified at the hearing.

*A. Summary of Relevant Evidence*

At the hearing, the social worker testified the allegations of the two incidents of domestic violence described in the petition are supported by the reports issued by responding officers, which were based on statements made by the parents and I.B. and the officers' observations. Those reports, which are attached to the jurisdiction and disposition report dated April 7, 2025, stated both incidents were "over a cell phone" and involved issues of "possible cheating" in the parents' relationship.

Consistent with information in the police reports, I.B. testified at the hearing she had not witnessed any incident of physical fighting between the parents. The social worker testified that from the time of the February 9, 2025 incident until the petition was initially filed on March 7, 2025, there was no evidence of domestic violence between the parents although they continued to live together with the child and I.B. during that time period. Further, he noted there was no evidence of domestic violence before the prior incident of domestic violence in early February 2025.

The social worker testified that at the end of the Agency's safety and risk assessment, the Agency had concluded the child and I.B. were safe in the home with both parents with a safety plan. After Mother refused to cooperate with the Agency and sign the safety plan, however, the Agency decided to file the petition. That same day, Father acknowledged wrongdoing on his part and stated the incident was unfortunate and regrettable, the parents had behaved poorly, and he was a safe parent overall. The social

6

worker could not explain why the Agency went from filing a noncustodial petition to seeking the removal of the child from both parents.

The social worker acknowledged the child had not suffered any physical injury while in Father's care and custody. He further testified the child is not at substantial risk of physical injury in the custody of Father; indeed, Father was permitted to have unsupervised visits with the child because the social worker did not believe there is a substantial risk of physical harm to the child when visiting Father alone.

Instead, the social worker believed the child is at risk when in the care and custody of both parents at the same time due to the potential of another domestic violence incident. He testified he was unable to speak with either Mother or Father regarding the domestic violence because they invoked their constitutional right not to incriminate themselves. He noted the parents have otherwise not demonstrated insight with respect to the impact domestic violence has on children.[4]

The social worker also testified he did not think the child was at risk due to Father's criminal history. He acknowledged the District Attorney refused to press charges against Father as a result of the February 9, 2025 incident. The social worker did not believe Father had an unresolved substance use issue and stated he "would be okay" with the juvenile court

---

[4] The social worker testified Mother attempted to enroll in a personal empowerment program but was not eligible because she said she had not experienced domestic violence in her life. As to Father, the social worker testified Father did not accept services offered by the social worker because he was not comfortable signing any type of paperwork, including referrals or releases of information. Father completed two different parenting classes and an anger management class and is on the waiting list for counseling services. He has refused, however, to sign a release of information regarding his then-in-progress services.

dismissing the petition's allegations regarding Father's criminal history with respect to driving without a valid license, driving under the influence, and possession of a controlled substance.

*B. The Juvenile Court Asserts Jurisdiction Over the Child, Returns the Child to Mother's Custody with Family Maintenance Services, and Removes the Child from Father's Custody with Enhancement Services*

Following the jurisdiction and disposition hearing, the juvenile court found the allegations of the petition true by a preponderance of the evidence and declared the child a dependent child of the court under section 360, subdivision (d). The court found reasonable efforts had been made to "eliminate the need for removal of the child from [F]ather's home" and further found, by clear and convincing evidence, that vesting custody of the child with Father would be detrimental to the child.[5] The court further ordered that custody of the child would remain vested with Mother. The court adopted the Agency's recommendation to provide family maintenance services to Mother and enhancement services to Father.

Mother and Father each appealed from the jurisdiction order and Father also appealed from the disposition order.[6]

---

[5] As pointed out in Father's opening brief, the juvenile court's minute order references section 361, subdivision (d) for this finding when it should have cited section 361, subdivision (c)(1) because Father was a custodial parent at the time the petition was filed.

[6] In their respective opening briefs, Father and Mother have joined each other's arguments on appeal.

8

DISCUSSION

I.

SUFFICIENT EVIDENCE SUPPORTS THE JUVENILE COURT'S JURISDICTION
FINDING UNDER SECTION 300, SUBDIVISION (b)(1)

The juvenile court asserted jurisdiction over the child pursuant to section 300, subdivision (b)(1). A court may exercise jurisdiction under this section if the court finds by a preponderance of the evidence that, as relevant here, "there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [¶] . . . [t]he failure or inability of the child's parent . . . to adequately supervise or protect the child." (§ 300, subd. (b)(1)(A); see *In re Joaquin C.* (2017) 15 Cal.App.5th 537, 560–561.)

"'We review the jurisdictional findings for substantial evidence. [Citation.] We consider the entire record, drawing all reasonable inferences in support of the juvenile court's findings and affirming the order even if other evidence supports a different finding. [Citation.] We do not consider the credibility of witnesses or reweigh the evidence.' [Citation.] 'The parent has the burden on appeal of showing there is insufficient evidence to support the juvenile court's order.'" (*In re L.B.* (2023) 88 Cal.App.5th 402, 411–412.)

Neither Mother nor Father challenge the sufficiency of the evidence that the two incidents of domestic violence, as described in the petition, occurred. Instead, they both argue the evidence is insufficient to support child welfare jurisdiction because there is no evidence of current substantial risk of harm to the child at the time of the jurisdiction hearing.

"It is well settled that physical violence between a child's parents may support the exercise of jurisdiction under subdivision (b)(1) of section 300 where there is evidence that the domestic violence has placed the child *at risk* of physical harm and the violence is ongoing or likely to recur."

9

(*In re L.B., supra*, 88 Cal.App.5th at p. 411.) Here, substantial evidence shows the parents were involved in two separate instances of domestic violence days apart. (See *ibid.* ["in a domestic violence situation, past violence is highly probative of the risk that violence may recur"].) During the latter incident, Father was holding the child who was crying at the time.

In addition, evidence shows Mother does not believe she has been involved in domestic violence, the parents have not addressed their domestic violence issues to prevent further incidents from occurring, and neither parent has acknowledged the negative impact of domestic violence on the child. Consequently, viewing the evidence in the light most favorable to the juvenile court's decision below, we conclude substantial evidence supports the court's jurisdiction order.

## II.

### INSUFFICIENT EVIDENCE SUPPORTS THE DISPOSITION ORDER AS TO FATHER

Before the juvenile court may order a child removed from his or her parent, it must find, by clear and convincing evidence, "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the [child] if the [child] were returned home, and there are no reasonable means by which the [child's] physical health can be protected without" removal. (§ 361, subd. (c)(1).) "The parent need not be dangerous, and the [child] need not have been actually harmed" for removal to be appropriate. (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136, disapproved on another ground in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.) "The focus of the statute is on averting harm to the child." (*In re Diamond H., supra*, at p. 1136.)

"[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether

10

the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996.)

Father argues insufficient evidence supports the juvenile court's finding by clear and convincing evidence that vesting physical custody of the child with Father would pose a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child. The court did not identify any evidence supporting the disposition order at the hearing or in the disposition order itself. Significantly, at the jurisdiction and disposition hearing, the social worker directly testified that vesting custody of the child with Father did *not* pose any such risk:

"[Father's counsel:] I had asked you whether or not you thought that [the child] was at substantial risk in the care and custody of [Father], and you had said no, not when he's by himself. [¶] Is that right?

"[Social worker:] Yes.

"[Father's counsel:] So your concern is when the parents are together; is that right?

"[Social worker:] Yes.

"[Father's counsel:] . . . [T]he recommendation that you're making to the [c]ourt is family maintenance for [Mother]; is that right?

"[Social worker:] Yes.

11

"[Father's counsel:] And enhancement services for [Father]; is that correct?

"[Social worker:] Yes.

"[Father's counsel:] . . . [¶] Is it your understanding that enhancement services are usually offered to the noncustodial parent?

"[Social worker:] Yes.

"[Father's counsel:] And that enhancement services are provided to give a vehicle to the noncustodial parent to try and work themselves back into a position where they can become a custodial parent.

"[Social worker:] Yes.

"[Father's counsel:] Your testimony is that you don't have any safety concerns for [the child] in the care of [Father] when he's by himself, correct?

"[Social worker:] Yes.

"[Father's counsel:] So wouldn't it be more accurate to say that your recommendation actually is joint family maintenance to the parents?

"[Social worker:] Could you repeat that?

"[Father's counsel:] Sure. [¶] You've informed us that you understand what enhancement services are; they're usually for the noncustodial parent, correct?

"[Social worker:] Yes.

"[Father's counsel:] And enhancement services are provided to the noncustodial parent in order to be able to demonstrate their safety and work themselves into a position where they can become a custodial parent, correct?

"[Social worker:] Yes.

12

"[Father's counsel:] Okay. But your testimony also is, is that you don't have any safety concerns for [the child] when he is in the care and custody of [Father], correct?

"[Social worker:] Yes.

"[Father's counsel:] Okay. So [Father] doesn't necessarily need to work himself back into a position to become a custodial parent of [the child], right?

"[Social worker:] Yes.

"[Father's counsel:] Okay. So is it more accurate to say that your recommendation, as it relates to [the child], is a joint family maintenance; meaning family maintenance to [Mother] and family maintenance to [Father]?

"[Social worker:] I believe if we were to recommend family maintenance to [Father], that would mean that he would be allowed back in the home. And I believe that without addressing the incidents of domestic violence, that would not be appropriate.

"[Father's counsel:]. Okay. So your only holdup—your issue is Father being allowed back in the home; is that right?

"[Social worker:] Without addressing the domestic violence, yes.

"[Father's counsel:] But you've never heard of a joint family maintenance where the parents were residing at the residence.

"[Social worker:] No.

"[Father's counsel:] Okay. You wouldn't be opposed to that, correct?

"[Social worker:] To . . .

"[Father's counsel:] A joint family maintenance with [Mother] and [Father] residing in a different residence, right?

13

"[Social worker:] You're asking if I would or would not be opposed? I'm sorry. I think I confused myself.

"[Father's counsel:] Would you be opposed to that?

"[Social worker:] No.

"[Father's counsel:] Okay. All right. [¶] So the sole variable, the sole safety risk that you are presenting to this [c]ourt as the basis of your opinion, as far as [the child is] concerned, is [Mother] and [Father] when they are together; is that right?

"[Social worker:] Yes."

Although the social worker testified that the only safety risk to the child exists when the parents are together, it does not appear the social worker had considered the option of vesting custody of the child with both parents with family maintenance services, under the condition they continue to live separately. The social worker unequivocally testified he would not oppose such an arrangement.

We see nothing in the relevant statutory scheme that would prohibit such an option. County counsel does not address much less argue otherwise in the respondent's brief.

As insufficient evidence shows "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the [child] if [he] were returned [to Father]" (§ 361, subd. (c)(1)) or shows "there are no reasonable means by which the [the child]'s physical health can be protected without removing the minor from [Father]" (*ibid.*), we must reverse the disposition order to the extent it removes custody of the child from Father.

14

## DISPOSITION

The jurisdiction order is affirmed. The disposition order as to Father is reversed. The matter is remanded to the juvenile court to order return of the child to Father's custody with family maintenance services on the condition the parents continue to live separately.

MOTOIKE, ACTING P. J.

WE CONCUR:

MOORE, J.

DELANEY, J.

15